CENTRAL & SOUTHERN MOTOR FREIGHT TARIFF ASSOCIATION, Inc., et al., Plaintiffs,

and

Freight Forwarders Institute, Intervening Plaintiff,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants,

and

Railway Express Agency, Inc., and the Drug and Toilet Preparation Traffic Conference, Intervening Defendants.

Civ. A. No. 3224.

United States District Court
D. Delaware.
Aug. 29, 1967.

David A. Drexler, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for plaintiffs.

Bryce Rea, Jr., Washington, D. C., for plaintiff motor carrier associations.

William H. Dempsey, Jr., James B. Goodbody, Harry C. Ames, and James L. Givan, Washington, D. C., and Giles Morrow, New York City, for plaintiff freight

forwarding companies and intervening plaintiff Freight Forwarders Institute.

Alexander Greenfeld, U. S. Atty., and L. Vincent Ramunno, Chief Asst. U. S. Atty., Wilmington, Del.; Donald F. Turner, Asst. Atty. Gen., John H. D. Wigger and Henri F. Rush, Jr., Attys., Department of Justice, Washington, D. C.; Robert W. Ginnane, General Counsel I.C.C., and Leonard S. Goodman, Asst. General Counsel I.C.C., Washington, D. C., Attys., for United States of America and Interstate Commerce Commission.

John Van Brunt, Jr., of Killoran & Van Brunt, Wilmington, Del., Richard M. Freeman and Nuel D. Belnap, of Belnap, Spencer, Hardy & Freeman, Chicago, Ill., for intervening defendant, Drug and Toilet Preparation Traffic Conference, Inc.

John Van Brunt, Jr., of Killoran & Van Brunt, Wilmington, Del., and William Q. Keenan, New York City, for Railway Express Agency, Inc., intervening defendant.

Before FREEDMAN, Circuit Judge, WRIGHT and LAYTON, District Judges.

## OPINION

CALEB M. WRIGHT, District Judge:

This action is brought under 28 U.S. C.A. § 1336 (1966) to set aside two Reports and Orders of the Interstate Commerce Commission. Aggregate Rates on Wearing Apparel—Railway Express Agency, 318 I.C.C. 737 (1963) and 326 I.C.C. 92 (1965). In the 1963 case the Commission found the aggregate rate structure used by the Railway Express Agency (REA) was just and reasonable. In the 1965 Opinion the Commission found the same rate structure was compensatory.

Aggregate rates, for the purposes of this case, are discount rates which apply to shipments of goods from one shipper to multiple consignees, provided the shipper tenders the goods at one time to REA. The size of the discount depends upon the gross weight tendered by the shipper; it ranges from 37.1% of first class for tenders of 300 pounds to 58.6% for tenders of 10,000 pounds.[1]

Aggregate rate-making was first successfully employed in 1957 from seven West Coast origin points to all destinations.[2] As originally published the shipper received a discount if his shipment grossed 300 lbs. and further discounts if his shipment attained 1500 lbs. or 2500 lbs. These 1957 rates were the subject of an investigation, inaugurated on August 31, 1955, which culminated in a Division 3 Opinion sustaining the rates as just and reasonable. Wearing Apparel, Railway Express Agency, Inc., 301 I.C.C. 177 (1957) (hereafter cited as the 1957 Opinion). The 1957 Opinion noted that the rates were instituted to compete with parcel post, and to utilize REA's substantial unused capacity. The Opinion further spoke of "apparent" economies in handling aggregated traffic. These economies were in pickup—"direct labor costs of vehicle service"—in delivery—since the type of traffic shipped generally moved to downtown urban destinations—and in billing and bookkeeping—the 1957 rates were not applicable to collect shipments, so all the parcels aggregated would be billed on one invoice to the shipper.

Subsequently REA put these aggregate rates into effect for New York City shippers to 435 destinations for aggregations of 10,000 lbs., 15,000 lbs., and 20,000 lbs. In 1959 REA sought to reduce

---

1. First class rates are those rates applicable to the general run of shipments; these rates are applicable to all shipments except food and drink which are rated second class, and are accorded rates equivalent to 75% of first class. The aggregate tariff under consideration here is one of a series of exceptions to the first class ratings.

2. A tariff called an "aggregate tariff" had been instituted in December 1932, but that tariff was markedly dissimilar from the one being considered here. It was disallowed by the Commission in 1933. Aggregating Express Shipments, 192 I.C.C. 301 (1933).

the size of the discount accorded 300 lb. aggregations, but the Commission demurred and required instead that REA make its aggregate rates available to all origins and destinations throughout the United States. In 1960 REA published a new tariff extending the aggregate rates to the entire United States, and making them applicable to collect as well as prepaid shipments. Plaintiffs and other competitors of REA complained, and the Commission entered an Order suspending the proposed tariff until September 6, 1960. After vehement protest by REA's shippers, the Commission rescinded its suspension order and permitted the rates to take effect provisionally. In January of 1963, one and one-half years later, Division 2 entered its Opinion without a Report from the Hearing Examiner. This 1963 Opinion, in the main, dealt with the legality of a consolidation rule which applied to collect as well as prepaid shipments. The 1963 Opinion reserved for another proceeding the question of the rate's compensativeness, since the record did not contain certain data requisite to compute the rail-car-foot-mile line-haul expense, an indispensable element in the equation used to determine compensativeness. Finally, on December 7, 1965, the Commission handed down its Opinion finding the aggregate rates compensatory.

The plaintiffs' attack is threefold: 1. the aggregate tariff is discriminatory in violation of 49 U.S.C.A. § 2 (1959); 2. REA's use of a wholly-owned consolidator violates 49 U.S.C.A. §§ 2, 3 (1959); and, 3. as applied to collect shipments, the tariff is fatally vague under 49 U.S.C.A. § 6 (1959). Subsidiary contentions are directed to the Commission's failure to comply with § 8 of the Administrative Procedure Act, 5 U.S.C.A. § 1007(a) (1950). The alleged failure of compliance is twofold: the Commission's bypassing of the examiner's report with the most perfunctory statement of urgency; and the Commission's failure to set forth a complete statement of the reasons supporting its finding of reasonableness.

## DISCRIMINATION

Section 2 of the Interstate Commerce Act, 49 U.S.C.A. § 2 (1959) provides:

"If any common carrier subject to the provisions of this chapter shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect, or receive from any person or persons a greater or less compensation for any service rendered or to be rendered, in the transportation of passengers or property, subject to the provisions of this chapter, than it charges, demands, collects, or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is prohibited and declared to be unlawful."

It is conceded that REA charges a lesser rate for a 100 lb. shipment moving from New York to San Antonio, for example, which is aggregated with other shipments to total 10,000 lbs. than it charges for an unaggregated 100 lb. shipment moving from New York to San Antonio.[3] Thus, the relevant question is whether the two shipments hypothesized are given a "like service" and whether they are "a like kind of traffic" being transported "under substantially similar circumstances and conditions."

Since the very inception of the Interstate Commerce Act, it has been recognized that reduced costs for one type of shipment would justify that shipment's receiving a lower rate. E. g., F. B. Thurber v. New York Central & Harlem R. R., 3 I.C.C. 473 (1890). The Interstate Commerce Commission urges

---

3. One of the most common examples used by the parties arguing this case was the rates applicable to shipments from New York to San Antonio. A nonaggregated 100 lb. package would cost the shipper $15.27 whereas a 100 lb. package which was part of a 10,000 lb. aggregation would cost the shipper only $8.27.

forcefully that costs savings are involved here. The Commission argues that a single, as opposed to a multiple, pickup of a given number of packages involves inherent economies which Division 3 alluded to in its 1957 Opinion. The plaintiffs counter by showing that the Commission's 1965 Opinion on the compensatory issue restates REA's origin costs by 50% to 44.85¢.[4] The plaintiffs' contention is that this restatement of origin costs shatters REA's contention that there are significant operating economies in aggregate service. But, even this restatement of REA's costs leaves a marked discrepancy between origin and destination costs—44.85¢ and 58¢ respectively; origin costs are only 77.3% of destination costs. Not having before it any evidence as to the "normal" relationship between origin and destination costs, this Court is ill-equipped to predicate a finding of the presence or absence of cost savings in aggregate traffic upon so flimsy a foundation.

Hence, since the 1963 opinion makes no mention of cost differentials, and since the 1965 opinion casts some doubt upon the accuracy of the generalities voiced in the Commission's 1957 Opinion, this Court is unclear as to whether there are actual cost differentials between aggregated and ordinary traffic, and just what those differentials may be.

The plaintiffs take the further position that the challenged rate reduction must be no greater than the reduction in costs.

In support of this contention they cite a 1933 Commission Opinion which also involved a REA tariff. In the 1933 case REA sought to reduce the rate applicable to express shipments which were consolidated at the consignee's end of the shipment, and delivered at one time. In holding the consolidation rule unreasonable, the Commission said:

"[E]ven were the respective services rendered on each lot as described by respondent, the relative minor differences in service which would ensue are not shown to be sufficiently great to warrant the substantial differences in charge which would result if the proposed rule were approved. [Citations omitted]." Aggregating Express Shipments, 192 I.C.C. 301, 311 (1933).

Apparently, however, the Commission has retreated from the full implications of the above quotation—that rate reductions must be proportionate to economies—in its more recent opinions. Petroleum Rail Shippers' Ass'n. v. Alton & S. R., 243 I.C.C. 589, 625 (1941). Regardless of the Commission's shift away from the inflexibility of its 1933 approach, it would seem patently obvious that insignificant differences in costs should not be invoked as the sole justification for exorbitant reductions in rates. Yet, nowhere in the 1963 or 1965 Opinions does the Commission undertake a full examination of this facet of the "cost justification" problem.[5]

4. In order for a proposed rate to be found "just and reasonable" within §§ 1(5) and 15(7) of the Interstate Commerce Act, 49 U.S.C.A. §§ 1(5) and 15(7) (1959), the Commission must find that it is compensatory. See Missouri Pacific R. Co. v. United States, 203 F.Supp. 629 (E.D. Mo.1962). See also Chicago & E. I. R. Co. v. United States, 107 F.Supp. 118 (S.D.Ind.1952), aff'd, 344 U.S. 917, 73 S.Ct. 346, 97 L.Ed. 707. Before placing extraordinary reliance on these figures, it is well to note the caveat of the old Illinois Circuit Court that such cost computations are never accurate but only approximate at best. Interstate Commerce Comm'n. v. Chicago Great Western R., 141 F. 1003 (D.C., 1905), aff'd, 209 U.S. 108, 28 S.Ct. 493, 52 L.Ed. 705.

Also, figures may be conservatively stated to assure that the tariff is compensatory, and yet such conservatism may be impolitic when scrutinizing for compliance with § 2.

5. By this the Court means to indicate that the Commission's statement in the nonintegral but factually related 1957 Opinion that aggregate traffic is "more economical to handle" should not be the last word on the § 2 problem. The question should be whether it is substantially more economical to handle the traffic in such a way, and what is the relationship between the size of the economies involved and the rate reduction. The relationship need not be one of precise congruity, but it must be a reasonable one.

■■ REA argued before the Commission, and it urges here that another element of costs should be considered. The discussion above relates to average variable costs attributable to a shipment.[6] REA's further contention is that the appropriate consideration when examining for a cost justification is marginal cost—given REA's existing capacity, what would be the cost of transporting an additional number of parcels over existing routes. Or, put another and slightly different way, that the economies resulting from reduced average fixed costs should be considered when passing upon the relationship between the cost savings and the proffered rate reduction. Reduced average fixed costs —which always accompany increased volume when there is unused capacity— have never been considered an element of cost-saving in traditional § 2 analysis. In fact, as the plaintiffs point out, using such "cost savings" to justify rate reductions would permit any rate reduction—where the carrier's demand curve was the slightest bit price elastic, and the carrier was not operating at full capacity—since rate reductions would increase demand, allowing the carrier to spread its fixed costs over a greater volume of shipping.[7] Further, any such treatment of average fixed cost economies would run counter to the legislative spirit which is the very heart of § 2. One of the principal abuses to which § 2 was addressed was the favor-

ing of large shippers simply because they were large, and could generate a large amount of business. Providence Coal Case, 1 I.C.C. 316 & 363 (1887).

It has been suggested that competitive conditions will justify an apparent discrimination among shippers. The theory is that competition alone will suffice to support a finding of different circumstances and conditions. As support for this position the intervening defendants cite Eastern-Central Motor Carrier Ass'n v. United States, 321 U.S. 194, 64 S.Ct. 499, 88 L.Ed. 668 (1944), and L. T. Barringer & Co. v. United States, 319 U.S. 1, 63 S.Ct. 967, 87 L.Ed. 1171 (1943).

*Eastern-Central* is perhaps the most important § 2 case to have been decided in some time, and a full understanding of its ramifications is essential in order that § 2 be correctly applied. *Eastern-Central* involved a dispute between railroads and motor carriers over the rate applicable to shipments of linoleum. In substance, the motor carriers' truckload capacity was 20,000 lbs. whereas the carload capacity of the railroads was 30,000 lbs. With rates geared exclusively to cost justifications the railroads were in an advantageous inter-modal competitive position, since they could offer the shipper an additional weight break for shipments in excess of 30,000 lbs. The railroads' rates were 70% of first class up to 30,000 lbs. and 45% thereafter. The motor carriers, in order to compete more

6. The discussion which follows assumes a rudimentary acquaintance with the economic theory of the firm. Average variable costs (AVC) are those costs which are attributable to the operation of the enterprise as a productive unit—labor, raw materials, power, etc.—divided by the firm's output. Average fixed costs (AFC), on the other hand, are costs which over the short run would be incurred regardless of the operation *vel non* of the firm—examples of this sort of cost are lease payments, property taxes, investment, debt service, etc.— to get an average, fixed costs are divided by output. Marginal cost (MC) is the additional cost which will be incurred, at a given productive level, if one more unit of output is added. Since, within a given range of operations, increased output does not affect fixed costs, the marginal cost of an additional unit is much smaller than its average total cost (ATC) which is the sum of (AVC) and (AFC).

7. A demand curve which is price elastic is one which indicates that the consumer is price responsive. If price is decreased the consumer will increase his consumption of the product, shifting resources away from substitute sources of gratification. This generalization assumes that the variable cost component of the increased output would not be markedly dissimilar to the average variable costs at the level of output prior to the increase.

effectively with the railroads, introduced a tariff with rates of 70% of first class up to 20,000 lbs., 47.5% for shipments from 20,000 to 30,000 lbs., and 45% on shipments over 30,000 lbs. The railroads sought to have the additional weight break at 30,000 lbs. declared unreasonable, since it could not be supported by reduced costs. The Commission agreed, finding the rate reduction for shipments in excess of 30,000 lbs. to be unreasonable. The Supreme Court reversed and remanded, finding the Commission's interpretation of § 2 wooden. The Supreme Court noted that although the Commission's exclusive preoccupation with cost justification had previously met with approval, that approval was prior to the advent of effective intermodal competition.

"But with the evolution of other forms of carriage * * * a new situation arose. The Commission's task no longer was merely the regulation of a single form of transport * * *. It became, not merely the regulator, but to some extent the coordinator of different modes of transportation. With the addition of water and motor carriage to its previous jurisdiction over rails, it was charged not only with seeing that the rates and services of each are reasonable and not unduly discriminatory, but that they are coordinated in accordance with the National Transportation Policy, as declared by the later legislation." 321 U.S. at 205–206, 64 S.Ct. at 505.

▮▮▮▮▮ In the 1963 and 1965 opinions there is some measure of competitive conditions, as in the 1957 opinion. 318 I.C.C. 739–44 (1963); 326 I.C.C. 95–98 (1965); 301 I.C.C. 179–82, 194–96 (1957). But neither the 1963 nor the 1965 opinions undertake the searching inquiry which would show that these aggregate rates are justified by competitive conditions. Absent such an in depth inquiry this Court is loath to affirm the administrative action, for the Supreme Court has stated that this is a matter, in the first instance, for the Commission's expert judgment.[8]

Finally, it should be pointed out that although REA's excess capacity, which gives rise to a reduction in fixed costs with increasing volume, is not a proper matter for traditional § 2 cost justification analysis, perhaps excess capacity is a relevant concern when the Commission strives to implement the National Transportation Policy. It may well be that inefficiencies and misallocation of resources in the transportation system as a whole, created by REA's stagnation vis-a-vis motor carriers and parcel post, would warrant the use of aggregate rates to redress the competitive imbalance and "foster sound economic conditions in transportation."[9] Cf., Transcontinental Bus System, Inc. v. Civil Aeronautics Board, 383 F.2d 466, (5th Cir. 1967) (sustaining CAB conclusion that reduced military fares not discriminatory, but justified in the interests of national defense).

## WHOLLY-OWNED CONSOLIDATOR

At this point it becomes necessary to define some terminology used in the transportation industry. A "freight forwarder" is one who receives individual shipments, aggregates those headed for the same destination, and then ships the aggregate to himself at the destination where he breaks up the aggregate and delivers the individual shipments to the individual consignees. A "consolidator", on the other hand, operates at only one end of the shipment, pick-up or delivery, aggregating parcels and

8. Nor does this Court feel that it is entitled to use the analysis contained in the 1957 opinion to supplement the shortcomings of the present record. The 1957 opinion was in a different, albeit related case and the issue there was an aggregate tariff of more limited application.

9. The Court should not be understood as making any such finding. The Court's research has, however, suggested the possible applicability of these and similar considerations of transportation policy. This again is, in the first instance, a matter for the informed judgment of the Commission.

tendering them to the carrier, or delivering parcels shipped to it from multiple consignors, destined for multiple consignees.

▉▉▉▉ The REA rates may be taken advantage of by consolidators. In fact, REA cannot legally refuse consolidators the benefit of its aggregate rates. Interstate Commerce Commission v. Delaware, Lackawanna & Western R., 220 U.S. 235, 31 S.Ct. 392, 55 L.Ed. 448 (1911).[10] But, in 1960 REA acquired the stock of Fast Service Shipping Terminals, Inc. (FSST), a New York consolidator. And currently, REA has subsidiary consolidators in three large cities: New York, Boston, and Los Angeles. The plaintiffs allege that these affiliations violate 49 U.S.C.A. §§ 2 and 3 (1959). The affiliations violate § 2, they argue, because the economies which justify the aggregate tariff are offset, directly or indirectly, by increased costs to REA when its subsidiaries do the aggregating.[11] The Commission summarily disposed of this argument with the statement that, absent a demonstration that the subsidiary was being used to subvert the legislative purpose, the separate corporate entities could not be disregarded. The Commission also indicated that the consolidator issue would best be postponed to another proceeding. The plaintiffs further argue that the use of wholly-owned consolidators violates § 3 because the decision to establish these consolidators in one community and not in another gives the former community an unreasonable preference. Although the Commission saw the § 2 problem which wholly-owned consolidators present, the Commission did not raise the possibility of a § 3 violation at all in its Opinions. Needless to say, the possibility of a § 3 problem arises whenever a carrier undertakes to perform an appurtenant service in one community and not in another. See Chesapeake & O. Ry. v. Westinghouse, Church, Kerr & Co. Inc., 270 U.S. 260, 46 S.Ct. 220, 70 L.Ed. 576 (1926), and Clemens Produce Co. v. Denver & R. G. R. R., 208 Mo.App. 100, 219 S.W. 660 (1920). Naturally, the defense of competitive necessity, and the justification of the policy considerations set forth in the National Transportation Policy, could be used to counter a charge that one locality was being unreasonably preferred over another. See L. T. Barringer & Co. v. United States, 319 U.S. 1, 63 S.Ct. 967, 87 L.Ed. 1171 (1943).

▉▉▉▉ This Court finds the Commission's treatment of the wholly-owned consolidator issue inadequate. Because of the widespread use of wholly-owned consolidators by the transportation industry as a whole it may be that consideration of the issue would be best deferred to a later proceeding where a comprehensive investigation could be staged. However, it is no answer to say, as the Commission did:

"However, we may not treat the operations of REA and its corporate child as a single commercial enterprise unless we can find that the separate entities were devised for the purpose of avoiding some clear legislative purpose embodied in the act. Cf., Schenley Distillers Corp. v. United States, 326 U.S. 432, 437 [66 S.Ct. 247, 90 L.Ed. 181] (1946). The record fails to show whether or to what extent

---

10. This, and similar cases, stand for the proposition that a carrier may not make rate discriminations depending upon the shippers' status as owner or bailee of the shipment.

11. This argument is potentially an extremely difficult one. On the most superficial level, of course, REA could directly bear the costs by permitting FSST to use REA vehicles and employees or by directly assuming FSST's operating costs. On a more sophisticated level of analysis REA must always bear the costs of its wholly-owned subsidiary, even if the most scrupulous regard for corporate boundaries is maintained. The Court is now speaking of "opportunity costs" which may accrue to REA because it has invested its capital in a relatively unprofitable line of economic endeavor vis-a-vis other investment alternatives. The "cost" would be borne in the lower rate of return realized by REA.

REA's competitors are adversely affected by REA's use of a wholly owned subsidiary as a freight consolidator or the extent to which, if any, the economies claimed to result from the aggregation of shipments are nullified by the costs of the subsidiary. Accordingly, we must reserve judgment. * * *" 318 I.C.C. at 741.

The Commission's reservation of decision is not an abuse of its discretion, nor is it an abdication of its regulatory responsibility. Probably the complicated issues would be best explored in a separate proceeding. Certainly, the question of whether a subsidiary corporation is being availed of for the purpose of escaping regulatory restrictions is distinguishable and severable from the legality of the tariff per se. Most legal tariffs may be administered discriminatorily. What is disturbing is the mechanistic, metaphysical incantation of the doctrinal bar of the corporate veil. Such doctrines lose much of their sacrosanctity when urged in the context of regulated industries. The fact that a subsidiary corporation exists should be a starting point for searching inquiry, not the finish line. Also disturbing is the Commission's failure to call attention to the § 3 problem. The factors which influence the decision of where to establish subsidiary services may be varied, sorting them out, and determining which were the motivating factors and if those factors were permissible considerations, poses a thorny regulatory problem which the Commission may defer to another proceeding, but one which the Commission may not sidestep completely.[12]

## INDEFINITENESS

■■■■■ Section 6 of the Interstate Commerce Act, 49 U.S.C.A. § 6 (1959), requires that common carriers print, and make available for public inspection, the rates applicable to shipments via that carrier. The legislative purpose behind § 6 was to supplement § 2. It was thought that notoriety of rates would militate against discrimination and preferential treatment. The smaller shipper could then stand up for his due, and demand equality of treatment. An essential corollary of this legislative purpose is that the rates so published be concrete and particularized so that the shipper may ascertain that "which is his due." Accordingly, in the interpretation of § 6 there has grown up the doctrine that the rate must not be vague or indefinite. E. g., Ephraim v. Safeway Trails, Inc., 341 F.2d 815 (2d Cir. 1965).

■■■■■ In Aggregating Express Shipments, 192 I.C.C. 301 (1933), the Commission invalidated an aggregate tariff on several grounds, one of which was indefiniteness. That tariff provided that shipments from several shippers in one area to one consignee could receive the lower rate permitted on aggregated shipments from one shipper to one consignee. The Commission thought the tariff unreasonable because of vagueness. The ultimate charge to be assessed depended upon the activities of several shippers, so the charges applicable to shipments could not be accurately predicted in advance of delivery. The Commission held:

"Moreover, the proposed rule which would in effect set up a rate which would be dependent upon what several shippers might do, and the charges thereunder would be uncertain and their computation confusing. It would militate against that certainty and clarity in tariff publication which Congress and the Commission have been endeavoring to foster ever since the Act to Regulate Commerce became law. [Citations omitted] Under section 6 of the act tariffs must be so published that the shipper 'may readily ascertain by an inspection of the schedules

---

12. Lest there be any misunderstanding, the inadequacy of the Commission's treatment inheres in its failure to raise the § 3 problem and in its summary statement of the doctrine applicable to the § 2 problem with respect to wholly-owned consolidators. The Commission was not wrong in deferring consideration of these problems to a later date.

exactly what will be the cost to him of the transportation of his property.' United States v. Chicago & A. Ry. Co., 148 Fed. 646, affirmed 212 U.S. 563 [29 S.Ct. 689, 53 L.Ed. 653.]" 192 I.C.C. 313–314.

The plaintiffs seek to make the above-quoted language applicable to the instant tariff by arguing that the consignee of a collect shipment cannot know in advance of shipment what the charges will be. But, there is one salient difference between the tariff in this case, and that in the earlier 1933 case. Here the charges are conclusively established at the moment of the consignor's tender of the shipment to the carrier, the consignee need only communicate with his consignor to know the exact amount of the charges. True, the charges are dependent upon the size of the shipper's tender, but the charges are not at the unbridled discretion of the carrier. As the Commission stated in the instant proceeding, in the one issue carefully covered in its Opinion, the law requires no more by way of certainty.

"Viewing the issue here in the light of these background cases, it is clear that the legality of the involved consolidation rule cannot be resolved by a simple application of Commission precedent. In our opinion, there is one overriding consideration present in all of the cases. To have a lawful rule, consolidation must be controlled by either the consignor or consignee and not left to the discretion of the carrier." 318 I.C.C. 746.

The Court finds the foregoing to be a correct statement of the principles governing the application of § 6. The proposed tariff does not transgress the requirement that it be definite and not vague.

## ADMINISTRATIVE PROCEDURE

■■■■ Section 8(a) of the Administrative Procedure Act, 5 U.S.C.A. § 1007 (a) (1950), provides that where, as here, an administrative body makes a determination without having presided at the original hearing those who presided at such hearings shall submit their recommendations. However, an exception to the requirement that there be an Examiner's Report is permitted "in any case in which the agency finds upon the record that due and timely execution of its functions imperatively and unavoidably so require[s]." 5 U.S.C.A. § 1007 (a) (1950). In the instant case, the Examiner's Report was dispensed with, but no explanation of the imperative circumstances was offered; the Commission merely introduced its 1963 Opinion with a repetition of the statutory language. 318 I.C.C. at 737. Although the Examiner's Report is not an indispensable element of administrative due process, Morgan v. United States, 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129 (1938), it is very helpful to inexpert tribunals which place a premium upon the rationalizations of specially qualified administrative bodies. The Examiner's Report should not be dispensed with unless the agency offers a greater justification than the rote repetition of the statutory enabling language. Ibid. Some statement of facts demonstrating the urgency of the situation is required. Even in those cases where Examiners' Reports have been eschewed for urgency or otherwise, the courts have uniformly held that the parties have a right to know the reasons for the administrative action, and, absent a full appreciation of the issues, the courts will not permit the agency to dispense with an Examiner's Report. Cf., N. L. R. B. v. MacKay Radio and Telegraph Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938). Here the Commission dispensed with the Examiner's Report after a year and a half had elapsed from the taking of testimony, and having done so, the Commission failed to grapple with the § 2 problem, and failed to give recognition to the § 3 problem. The Administrative Procedure Act requires more. 5 U.S. C.A. § 1007(b) (1950).

## CONCLUSION

■■■ In sum, as the Supreme Court has held when confronted with a similar

situation, the reviewing courts have a right to know the basis for the Commission's ruling. The after-the-fact theories of counsel for the various defendants cannot meet the shortcomings of the present record which is devoid of any reasoned analysis of the discrimination question. Cf. Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962). In *Burlington* the Commission chose additional certification rather than a cease and desist order to rectify transportation bottlenecks created by a labor union's secondary boycott. The Commission, however, did not set forth the reasons for its choice of the certification remedy. Mr. Justice White speaking for the Court, said:

> "Commission counsel now attempt to justify the Commission's 'choice' of remedy on the ground that a cease-and-desist order would have been ineffective. The short answer to this attempted justification is that the Commission did not so find. Securities & Exchange Comm'n v. Chenery Corp., 332 U.S. 194, 196 [67 S.Ct. 1575, 1577, 91 L.Ed. 1995]. The courts may not accept appellate counsel's *post hoc* rationalizations for agency action; Chenery requires that an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself * * *." 371 U.S. at 168–169, 83 S.Ct. at 246.

It is always tempting to seize the bit and run with it, but this Court is unwilling to do so, despite the fact that several years have already elapsed since this tariff was first published, and despite the fact that if the case is remanded several more will no doubt elapse before final disposition. This action presents a novel question of rate regulation, and the reviewing courts are entitled to have all the administrative expertise which the Interstate Commerce Commission is capable of mobilizing directed to a forthright analysis of the problems this tariff raises. Without such assistance any judgment by this Court would be premature and, worse yet, might detrimentally shape the rate structure of the regulated transportation industry for years to come.

The Orders of the Interstate Commerce Commission appealed from are vacated, and the matter is remanded to the Commission for proceedings not inconsistent with the foregoing Opinion.

Submit Order.