**CENTRAL & SOUTHERN MOTOR FREIGHT TARIFF ASSOCIATION, INC., et al., Plaintiffs,**
and
**Freight Forwarders Institute, Intervening Plaintiff,**
v.
**UNITED STATES of America and the Interstate Commerce Commission, Defendants,**
and
**Railway Express Agency, Inc., and the Drug and Toilet Preparation Traffic Conference, Intervening Defendants.**

**Civ. A. No. 3761.**

United States District Court,
D. Delaware.

July 7, 1972.

Bryce Rea, Jr., of Rea, Cross & Knebel, Washington, D. C., for plaintiff motor carrier associations.

William H. Dempsey, Jr., of Shea & Gardner, Washington, D. C., for plaintiff freight forwarding companies.

F. L. Peter Stone, U. S. Atty., Wilmington, Del., Leonard S. Goodman, Asst. Gen. Counsel I.C.C., Washington, D. C., Walker B. Comegys, Asst. Atty. Gen., Washington, D. C., John H. D. Wigger, Department of Justice, Washington, D. C., for United States of America and Interstate Commerce Commission.

John Van Brunt, Jr., of Killoran & Van Brunt, Wilmington, Del., John J. C. Martin, New York City, for intervening defendant Railway Express Agency.

Andrew G. T. Moore, II, of Killoran & Van Brunt, Wilmington, Del., Daniel J. Sweeney, of Belnap, McCarthy, Spencer, Sweeney & Harkaway, Chicago, Ill., for intervening defendant Drug & Toilet Preparation Traffic Conference, Inc.

## OPINION

Before HASTIE, Senior Circuit Judge, WRIGHT, District Judge, and LAYTON, Senior District Judge.

LAYTON, Senior District Judge.

This case is before this three-judge Court pursuant to the provisions of 28 U.S.C. § 1336, in an attempt to set aside and annul part of a Report and Order of the Interstate Commerce Commission, dated April 16, 1969, and receive any other relief which the Court might deem appropriate. This Court is no stranger to the matters raised in this case, for many of them were discussed by this Court in a previous action between these same parties, Central & Southern Motor Freight Tariff Association, Inc. v. United States.[1]

David A. Drexler, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for plaintiffs.

That action also had been brought under 28 U.S.C. § 1336 to set aside two Reports and Orders of the Interstate

[1]. 273 F.Supp. 823 (D.Del.1967).

Commerce Commission.[2] In the former proceeding, the Commission found that the concept and use of an aggregate rate were just and reasonable for the Railway Express Agency; in the latter proceeding, the Commission found that the specific rate structure published by REA was compensatory.

Aggregate rates available to Railway Express Agency customers are discount rates applicable to shipments of goods and materials from a single shipper to multiple consignees, providing that the gross weight of the goods tendered by the shipper met certain weight minima. The discount increases as the weight increases from 300 through 10,000 pounds.

Aggregate rate-making was first successfully employed in 1957 from seven West Coast origin points to all destinations.[3] As originally published, the shipper received a discount if his shipment grossed 300 pounds and further discounts if his shipments weighed 1500 pounds or 2500 pounds. These 1957 rates were the subject of an investigation, inaugurated on August 31, 1955, which culminated in a Division 3 Opinion[4] sustaining the rates as just and reasonable.[5] The 1957 Opinion noted that the rates were instituted to compete with parcel post, and to utilize REA's substantial unused capacity. The Opinion further spoke of "apparent" economies in handling aggregated traffic. These contemplated economies were in pickup, delivery, and in billing and bookkeeping.

Subsequently, REA put these aggregate rates into effect for New York City shippers to 435 destinations for aggregations of 10,000, 15,000, and 20,000 pounds. In 1959, the Commission required that REA make its aggregate rates available to all origins and destinations throughout the United States. In fulfilling that requirement, REA published a new tariff extending the aggregate rates to the entire continental United States, causing the plaintiffs and other competitors of REA to complain. These complaints resulted in a temporary suspension of the proposed tariff, but vehement protests by REA's shippers resulted in a recision of the suspension order. In January of 1963, one and one-half years later, Division 2 entered its opinion without having obtained a report from the hearing examiner. This 1963 Opinion, in the main, dealt with the legality of a consolidation rule. In December, 1965, the Commission handed down an Opinion finding that the aggregate rates were compensatory.

The plaintiffs raised before this Court a broad based attack on the Commission's procedures and Opinions. Among the issues singled out were (1) the aggregate tariff is discriminatory within the meaning of 49 U.S.C. § 2 (1959);[6] (2) REA's use of a wholly-owned consolidator violates 49 U.S.C. §§ 2, 3

---

2. These Reports and Orders were named Aggregate Rates on Wearing Apparel—Railway Express Agency, reported at 318 I.C.C. 737 (1963), and 326 I.C.C. 92 (1965).

3. A tariff called an "aggregate tariff" had been instituted in December 1932, but the tariff was markedly dissimilar from the one being considered here. It was disallowed by the Commission in 1933, Aggregating Express Shipments, 192 I.C.C. 301 (1933).

4. Wearing Apparel—Railway Express Agency, Inc., 301 I.C.C. 177 (1957), hereafter cited as the 1957 opinion.

5. Since this suit was filed, the Commission has approved aggregate rates as just and reasonable in many instances. Some of these are Consolidation of Freight Forwarder Shipments, 310 I.C.C. 190 (1960),

Multiple Shipments from California to Oregon and Washington, 315 I.C.C. 247 (1961), and Aggregate Rates, Rochester, New York, to Eastern, Central and Southern States, 325 I.C.C. 474 (1965).

6. § 2. If any common carrier . . . shall . . . by any . . . device, charge, demand, collect, or receive from any person or persons a greater or less compensation for any service rendered . . . ., in the transportation of . . . property, . . . than it charges, demands, collects, or receives from any other person or persons for doing . . . a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination. . . . .

(1959);[7] (3) the Commission failed to comply with the Administrative Procedure Act in that the Report of the examiner was bypassed perfunctorily; and (4) the Commission failed to set forth a complete statement of the reasons supporting its findings of reasonableness.[8]

In its opinion, the Court found that it lacked sufficient information to determine whether the cost differentials existing between aggregated and ordinary traffic were discriminatory or cost justified,[9] that the "inadequate treatment" of the issue of the wholly-owned consolidator left the Court unable to take action on the judgment of the Commission,[10] and that by the failure of the Commission to provide reasons for its summary dispensing with the Report of the examiner and its superficial, perfunctory treatment of issues raised by plaintiffs, the Commission had fallen short of the requirements of the Administrative Procedure Act.[11]

The Court disposed of the case on October 2, 1967, by vacating the Commission Orders which had been appealed and remanding the cause of action to the Commission for proceedings not inconsistent with its opinion.

The Commission issued an Order on October 9, granting to any party the right to seek a further hearing and excluding from the issues to be discussed in such a proceeding the matter of the wholly-owned consolidator. No party at any time sought a further evidentiary hearing, nor did the Commission require that such a proceeding occur. On January 15, 1968, the Commission, upon its own motion, consolidated for decision with Aggregate Rates on Wearing Apparel—Railway Express Agency, another proceeding which had been remanded by the United States District Court for the Eastern District of Michigan: Chemicals in Aggregate Shipments.

In the spring of 1969, one and one-half years after this Court's judgment, the Commission issued a Report and Order which reaffirmed its original holding that the aggregate rates did not violate 49 U.S.C. § 2.[12]

The plaintiffs have filed a timely appeal with this Court seeking to enjoin that part of the 1969 Report and Order which deals with them and receive such other relief as this Court may deem appropriate. They base their claims upon several issues, including: (1) The Commission failed to hold the aggregate tariff discriminatory under 49 U.S.C. § 2 (1959); (2) the facts asserted by the Commission do not support its conclusion; and (3) the Commission failed to

---

7. § 3. It shall be unlawful for any common carrier . . . to make, give, or cause any undue or unreasonable preference or advantage to any particular person . . . in any respect whatsoever; or to subject . . . any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever; Provided, however, That this paragraph shall not be construed to apply to discrimination, prejudice, or disadvantage to the traffic of any other carrier of whatever description.

8. 5 U.S.C. § 557(b), (c):
   (b) When the agency did not preside at the reception of the evidence, the presiding employee . . . shall initially decide the case. . . . When the presiding employee makes an initial decision, that decision then becomes the decision of the agency . . . unless there is an appeal. . . . When the agency makes the decision without hav-

ing presided at the reception of the evidence, the presiding employee . . . shall first recommend a decision. . . .
   (2) this procedure may be omitted in a case in which the agency finds on the record that due and timely execution of its functions imperatively and unavoidably so requires. . . .
   (c) . . . All decisions . . . shall include a statement of—
   (A) findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record. . . .

9. 273 F.Supp. at 828.

10. *Ibid.*, at 831.

11. *Ibid.*, at 833.

12. The Report and Order is named in full, Chemicals in Aggregate Shipments—Midland, Michigan, to the East, 333 I.C.C. 28–30, 36–38 (1969). Only a small part of the opinion deals with the case at bar.

even mention, much less discuss, the omission of the Report of the Examiner.

█ In our first opinion, remanding this cause to the Commission, we criticized the paucity of both findings and reasons for the conclusions reached by the Commission regarding the issue of discriminatory rates under 49 U.S.C. § 2. We recognized that reduced costs for one type of shipment can justify charging a lower rate for that shipment. The Commission alleged that single pickups of a given number of packages were inherently cheaper than multiple pickups, and, therefore, aggregate rates, which involved single pickups, should be lower than regular rates. The Court said, however, that it needed more illuminating evidence on this factual issue:

> "Not having before it any evidence as to the 'normal' relationships between origin and destination costs, this Court is ill-equipped to predicate a finding of the presence or absence of cost savings in aggregate traffic upon so flimsy a foundation." [13]

The Court continued:

> "This Court is unclear as to whether there are actual cost differentials between aggregated and ordinary traffic, and just what those differentials may be." [14]

These facts were clearly important to the Court because the rate reduction sought had to bear some reasonable relationship to the cost saving:

> " . . . it would seem patently obvious that insignificant differences in costs should not be invoked as the sole justification for exorbitant reductions in rates. Yet, nowhere in the 1963 or 1965 Opinion does the Commission undertake a full examination of this facet of the 'cost justification' problem." [*]

[Footnote *] By this the Court means to indicate that the Commission's statement in the nonintegral but factually

related 1957 Opinion that aggregate traffic is 'more economical to handle' should not be the last word on the § 2 problem. The question should be whether it is substantially more economical to handle the traffic in such way, and what is the relationship between the size of the economies invoked and the rate reduction. The relationship need not be one of precise congruity, but it must be a reasonable one.[15]

Thus, the Court clearly asked for a full examination of the cost justifications behind the lower rates charged by REA in the form of findings on origin and destination costs, savings from aggregation, and the relationships between the cost savings and the lowered rates.

The Commission failed to respond to the requests of the Court. In fact, it stated:

> "There is nothing herein to indicate that carrier costs savings justify the respondent's charging lower rates on aggregated shipments in contrast to normal traffic." [16]

Instead of adverting to the questions asked by this Court, the Commission went off on another ground. In its Opinion, the Court had stated that at times competitive conditions may justify what is in effect a discrimination among carriers. It also stated that the record before it was too skimpy to enable it to make such determinations:

> " . . . neither the 1963 nor the 1965 opinions undertake the searching inquiry which would show that these aggregate rates are justified by competitive conditions. Absent such an in depth inquiry this Court is loath to affirm the administrative action. . . ." [17]

On remand, the Commission held that the cost differentials were, indeed, vindicated by market considerations: "We conclude that the proposed rates are amply justified by competitive conditions." [18] Its reasons for that conclu-

---

13. 273 F.Supp. at 828.

14. *Ibid.*, at 826.

15. *Ibid.*, at 826.

16. 335 I.C.C. 37 (1969).

17. 273 F.Supp. at 830.

18. 335 I.C.C. at 37.

sion, however, were exactly the same as those which had been mentioned in its 1963 Report and Order, and found insufficient in this Court's Opinion. In fact, the language of the two Reports is almost identical, as these excerpts show:

### 1963 REPORT AND ORDER

The proposed rates are intended to assist REA in regaining some of the traffic which it has lost to other modes of transportation in recent years. In 1949 and 1958, respectively, its total intercity freight, in million of ton-miles, declined from 1,848 to 1,197. In those same years, the total intercity traffic of the railroads in millions of ton-miles, increased from 526,500 to 551,667, that of the motor carriers from 126,636 to 246,984, and that of the air carriers from 235 to 579. The general decline in intercity traffic handled by REA was particularly noticeable in the movement of wearing apparel.

During the period March through May, 1960, immediately prior to the time when the proposed rates became effective, the number of wearing apparel shipments handled by the respondent decreased by 14.2 percent below the number handled in the corresponding period of 1959. Since the proposed rates became effective on June 4, 1960, there has been a steady increase in the respondent's wearing-apparel traffic. In July and August 1960, the number of shipments handled increased 2.3 percent over the same period in 1959, and in September and October 1960, it increased 10.6 percent over the corresponding period of 1959. During the period July through October, 1960, the average charge and average weight per shipment were $4.14 and 44.2 pounds, respectively, as contrasted with $4.26 and 40.7 pounds in the corresponding period of 1959. According to the respondent's estimate for the months of July through October 1960, 604,888 additional shipments are attributable to the proposed rates, which yielded $2,186,803 of additional revenue.[19]

### 1969 REPORT AND ORDER

The proposed rates are intended to assist REA in regaining some of the traffic which it has lost to other modes of transportation in recent years. Between 1949 and 1958, its total intercity freight, in millions of ton-miles, declined from 1,848 to 1,197. In those same years, the total intercity traffic of the railroads, in millions of ton-miles, increased from 526,000 to 551,667, that of the motor carriers from 126,636 to 246,984, and that of the air carriers from 235 to 579. The general decline in intercity traffic handled by the respondent was particularly noticeable in the movement of wearing apparel.

During the period March through May 1960, immediately prior to the time when the proposed rates became effective, the number of wearing-apparel shipments handled by the respondent decreased by 14.2 percent below the number handled in the corresponding period of 1959. Since the proposed rates became effective on June 4, 1960, there has been a steady increase in the respondent's wearing-apparel traffic. In July and August 1960, the number of shipments handled increased 2.3 percent over the same period in 1959, and in September and October 1960, it increased 10.6 percent over the corresponding period of 1959. During the period July through October 1960, the average charge and average weight per shipment were $4.14 and 44.2 pounds, respectively, as contrasted with $4.26 and 40.7 pounds in the corresponding period of 1959. According to the respondent's estimate for the months of July through October 1960, 604,888 additional shipments are attributable to the proposed rates, which yielded $2,186,803 of additional revenue.[20]

---

19. 318 I.C.C. at 739.

20. 355 I.C.C. at 29–30.

In thus relying again on the very facts which this Court had expressly found insufficient to justify a finding of such competitive conditions as would allow REA to cost discriminate, the Commission has inexcusably ignored the authoritative ruling of this Court.

A third example of the cavalier attitude of the Commission merits mention. In its Opinion, the Court said that the elimination of the Report of the examiner required some further explanation:

"The Examiner's Report should not be dispensed with unless the agency offers a greater justification than the rote repetition of the statutory enabling language. Some statement of facts demonstrating the urgency of the situation is required." [21]

The Commission, on remand, never once adverted to the issue.

Finally, our Opinion concluded that the importance and novelty of the issues presented made it desirable that the Court have a clear and comprehensive analysis by the Commission in order to be able to base its decision upon a reasoned judgment of experts:

"This action presents a novel question of rate regulation, and the reviewing courts are entitled to have all the administrative expertise which the ICC is capable of mobilizing directed to a forthright analysis of the problems this tariff raises." [22]

By its refusal to inform the Court as requested, the Commission has deprived the Court of the benefit of its expertise. Such irresponsible inaction erodes the foundation upon which the interrelationships between agencies and reviewing courts are based.

In these circumstances, this Court is again confronted with an administrative decision that lacks the requisite clarity and specificity regarding important issues that impeded review of the 1963 and 1965 Reports and Orders of the Commission. The percentage of traffic of REA affected by the aggregate rates was never discussed. The overall profitability of the competing carrier systems was never analyzed. The actual effect on small and large shippers was never determined. At no point did the Commission carefully consider the discrimination or cost justification issues, nor did it mention the justification of competitive conditions until the case had been remanded. Furthermore, the Commission at no point adverted to the reasons behind its failure to require a report from a hearing examiner. Finally, it never carefully and systematically discussed the necessity for, workings of, and benefits attributable to the aggregate rate system in a manner which would enable the reviewing court to properly conduct its reviewing function.

Were the foregoing the only considerations, we would either remand the matter to the Commission for a third hearing, or attempt to solve the issues raised by this case. There is a major consideration, however, which militates against taking either of those courses of action: the issue of the legality of the specific 1960 REA tariff schedule rates is moot, and any broad based challenge to the concept of aggregate rates has not been clearly delineated by the plaintiffs.

The question of mootness was raised by a single defendant, REA, in its brief before this Court arguing for the affirmance of the 1969 Report and Order of the Commission. REA claims that the plaintiffs are challenging the rates, charges, and regulations in the original tariff schedule, rather than contesting in the abstract the use by REA of aggregate rates. REA points out that the current tariff schedule reflects drastic changes in commodities, rules, rates and charges, weight brackets, territory, etc., when compared to the original schedule, which was suspended by the action of this Court in vacating the 1963 and 1965 Reports and Orders of the Commission, and has been superseded many times

21. 273 F.Supp. at 833.

22. *Ibid.,* at 834.

over.[23] Therefore, REA argues that the plaintiffs should bring a complaint before the Commission to test the legality of the current tariff, and that the question of the legality of the 1960 tariff schedules is moot.

Plaintiffs argue that the mootness arguments are insubstantial for several reasons. First, they contend that the voluntary cessation of allegedly illegal conduct (the 1960 schedules) does not render a case moot unless the defendant meets the heavy burden of establishing that there is no reasonable basis for believing that the conduct will be repeated in the future. Second, plaintiffs argue that their challenges to tariff revisions will be mooted in front of the Commission simply by REA substituting a tariff alteration before the revisions

23. During the 1960's, major alterations to the aggregate rate structure applicable to wearing apparel were asymmetrically imposed upon the initial schedule. The original schedule, Tariff 18, I.C.C. 8319 was cancelled and transferred to Tariff 37, I.C.C. 8499. Tariff 37 was cancelled and its provisions were transferred to subsequent issues, Tariff 37-A, I.C.C. 8580, Tariff 37-B, I.C.C. 8605, Tariff 37-C, I.C.C. 8608, and Tariff 37-D, I.C.C. 8615.

The 37 series was cancelled and the aggregate rate provisions were transferred to Tariff 33-F, I.C.C. 8622, which was also cancelled. The provisions were carried over into Tariff 33-G, I.C.C. 8630, where they now fill an entire section of the Tariff, 10-A.

The rates were substantially increased as they were transferred from tariff schedule to tariff schedule.

On August 1, 1960, additional commodities were added in Item 70-L, Supplement 41, Tariff 18, I.C.C. 8319. Shipments containing packages having a density of less than ten pounds were accepted at various points throughout the country. This required the amendment of the aggregate rate provisions by the addition of exceptions to Rule 11 of the Official Express Classification 36, I.C.C. 8200, see: Tariff 18, I.C.C. 8319, Supp. 43,

Item 70-M; Tariff 37, I.C.C. 8499, Supp. 1, Item 600-A; Supp. 2, Item 600-B; Supp. 3, Item 600-C; etc.

Wearing apparel shipments were redefined to include advertising matter, Tariff 37, I.C.C. 8499, Supp. 4, Item 600-D. Certain commodities from specific points were eliminated by Tariff 37, I.C.C. 8499, Supp. 8, Item 600-G. Wearing apparel on hangers, which had originally been excluded from the aggregate rates, was made amendable to such rates, Tariff 37, I.C.C. 8499, Supp. 11, Item 600-I, and subsequently excluded again by Tariff 37, I.C.C. 8499, Supp. 15, Item 600-L.

The list of commodities which might take advantage of such schedule was expanded to include such items as ammunition, household appliances, cameras, surgical instruments, drugs, foodstuffs, paint, tools, etc. Tariff 37-A, I.C.C. 8580, Item 37:3100. The single rate applicable for all territories was replaced with a separate rate for each of three different territorial applications, compare Tariff 18, I.C.C. 8319, Supp. 36, pages 6 through 15, with Tariff 33-G, I.C.C. 8630, Supp. 9, pages 93 through 100.

In addition, the rates and charges have increased substantially in the ten year period from 1960 to 1970:

| Rate Scale | Shipment Weight | Suspended Charge | 1970 Charge | Percent Increase |
|---|---|---|---|---|
| 1 | 1 | 122¢ | 460¢ | 277% |
| | 50 | 129 | 462 | 258 |
| | 100 | 145 | 473 | 226 |
| 20 | 1 | 122 | 506 | 315 |
| | 50 | 242 | 562 | 132 |
| | 100 | 409 | 698 | 71 |
| 40 | 1 | 122 | 583 | 378 |
| | 50 | 363 | 688 | 90 |
| | 100 | 651 | 982 | 51 |
| 60 | 1 | 122 | 633 | 419 |
| | 50 | 475 | 767 | 61 |
| | 100 | 875 | 1155 | 32 |
| 80 | 1 | 122 | 704 | 477 |
| | 50 | 565 | 882 | 56 |
| | 100 | 1056 | 1365 | 29 |

might be reviewed. Third, even if the plaintiffs are not attacking REA's use of aggregate rates per se, they contend that a decision by this Court based upon the 1960 schedule, anchored upon the concept of aggregate rates, would have great precedential value in a subsequent proceeding attacking current rates.

■■ This action must be dismissed if the relief sought by the plaintiffs would not "grant any effectual relief to the[m]." [24] After carefully scrutinizing the plaintiffs' arguments against finding that the case is moot, this Court has concluded that those contentions are unsound.

First, regarding plaintiffs' argument that REA might reset its rate schedule at the levels described by the 1960 tariffs, this Court feels that the likelihood of REA lowering its rates to the 1960 schedules seems very dubious and highly speculative in view of the increases in the cost of living index over the past twelve years, and the large jumps in the actual tariffs charged by REA, see n. 23, supra.

The plaintiffs' second argument—that their challenges may be mooted by the filing of a new schedule by REA—is more substantial than the first. They argue that since the issue of mootness has been caused entirely by the actions of the defendant, this Court should rule on the 1960 schedule.

In support of this argument, plaintiffs cite United States v. W. T. Grant Co.[25] In that case, the government appealed from judgments dismissing civil actions brought against an individual and various corporations which he served as a

director, averring that such contracts violated § 8 of the Clayton Act. Soon after the complaints had been filed, the individual defendant resigned from his corporate positions, and the Court dismissed the actions as moot.

The Supreme Court stated that the case had not been mooted by the resignations:

"Both sides agree to the abstract proposition that voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case; i. e., does not make the case moot." [26]

This was due to the fact that the cessation would not resolve the controversy surrounding the action questioned:

"A controversy may remain to be settled in such circumstances, . . . e. g., a dispute over the legality of the challenged practices." [27]

In addition, the defendant would be under no obligation to refrain from the challenged action in the future:

"The defendant is free to return to his old ways. This, together with a public interest in having the legality of the process settled militates against a mootness conclusion." [28]

The Court went on to say that if the accused could meet the heavy burden of showing that the challenged conduct would not recur, then the matter might be mooted:

"The case may nevertheless be moot if the defendant can demonstrate that 'there is no reasonable expectation that the wrong will be repeated'." [29]

In order to qualify as a proper case for injunctive relief, however, the plaintiff

---

24. E. g., in Chicago Great Western Ry. Co. v. Beecher, 150 F.2d 394, 398 (8th Cir. 1945), cert. den., 326 U.S. 781, 66 S.Ct. 339, 90 L.Ed. 473 (1946), the Court said:

"Another well-established rule is that courts will decide only actual controversies, and that an appellate court, when an event has occurred which renders it impossible to grant any effectual relief to the appellant, will not proceed to judgment but will dismiss the appeal."

When we sit in review of an administrative agency, we are very much like an appellate court.

25. 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953).

26. *Ibid.*, 632, 73 S.Ct. 897.

27. *Ibid.*, 632, 73 S.Ct. 897.

28. *Ibid.*, 632, 73 S.Ct. 897.

29. *Ibid.*, 633, 73 S.Ct. 897.

must demonstrate the desirability of such a decision:

> "The moving party must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation; something more than the mere possibility which serves to keep the case alive." [30]

Plaintiffs' reliance on *Grant* is misplaced for several reasons. First, it is difficult to make out a challenged practice which the Court can rule upon. Second, if plaintiffs are seeking to enjoin REA from reinstating the 1960 schedules, they have failed to exhaust their administrative remedies, rendering premature a decision by this Court. Third, there is no reasonable expectation that the 1960 schedule will be reinstated. Fourth, under those circumstances, the public interest in an adjudication of the 1960 schedule is small. Fifth, plaintiffs have not satisfied this Court that relief from the 1960 schedule is needed. Thus, plaintiffs' second contention must be dismissed.

Plaintiffs' third argument against our finding that the issues presented by this case are moot is that since the 1960 schedule was based upon an aggregate rate concept, a determination of the legality of the 1960 schedule will have great precedential value in determining the propriety of any subsequent schedules filed with the Commission by REA which might be based upon the aggregate rate concept. A corollary to that argument is that a variation of an unlawful tariff schedule must also be unlawful.

Both arguments are insubstantial. A determination that the 1960 schedule was lawful would merely signify that the precise rates set forth in that schedule were just and reasonable.[31] It would not signify that all aggregate rates might be lawful, or even that any other aggregate rate would be just and reasonable. This is clearly true when dealing with an area in which, as in the case at bar, the rates have fluctuated widely in no apparent pattern, see n. 23, supra.

In addition, a variation of an unlawful tariff may be eminently legal, just as an alteration of a legal schedule may be clearly improper. Therefore, a determination of the legality of the 1960 tariff scheduled would not necessarily be relevant to the same determination of a subsequent schedule. Therefore, the plaintiffs' third contention must be dismissed.

However, the plaintiffs have raised arguments which might be construed as a per se challenge to this form of aggregate rates under 49 U.S.C. § 2 since the rate differentials were not justified by cost factors, and competitive considerations are insufficient as a matter of law to justify aggregate rates. Such a contention was certainly not clearly articulated by the plaintiffs before the Commission or this Court prior to the 1969 Commission opinion. Moreover, in its November 9, 1971 response to this Court's request for a clarification of the issues presented on this second appeal, the plaintiffs did not specify a per se attack. Nonetheless, in certain statements, e. g., June 28, 1971 letter from plaintiffs' counsel to this Court, the plaintiffs characterized their conception of the issues in this case in a manner which might appear to embody a per se challenge. If such an argument is raised, then this case is not moot since it is clear that the Commission reached its conclusion with sole reliance on competitive factors, and a decision on the per se issue would resolve these uncertainties regarding the impact of Section 2 on Commission determinations concerning aggregate rates. Assuming that the plaintiffs intended to raise the per se issue, this Court is of the opinion that

---

30. *Ibid.*, 633, 73 S.Ct. 898.

31. 49 U.S.C. § 1(5):
> "All charges made for any service rendered . . . in the transportation of passengers or property . . . shall be just and reasonable, and every unjust and unreasonable charge for such service . . . is prohibited and declared to be unlawful."

the issue has been neither adequately delineated nor sufficiently developed by the plaintiffs either before the Commission or this Court. Therefore, the present record is insufficient for this Court to decide an issue of such obvious import to the legality of aggregate rates. This is especially true since the Commission's sole reliance on competitive factors to justify the 1960 REA rates evidently resulted from the elimination of alternative justifications without consideration of the significance of Section 2 on that decision. While such unreasoned conclusions cannot be approved, the blame for this deficiency must be partially accepted by the plaintiffs for failing to articulate their per se argument. In light of the necessity for a detailed analysis by the Commission of such a significant issue, this Court does not view the matter as properly before it without the benefit of the Commission's expertise after an appropriate examination. Such an evaluation could only be accomplished by a further remand in which this additional question is clearly presented. Since it would necessitate a difficult analysis on a stale record of an issue not previously raised, such a remand does not appear to constitute the most effective way for the plaintiffs to present this question. Should the plaintiffs so decide, they may initiate a new action against REA's existing rates in which they clearly manifest the nature of the per se challenge they desire to litigate.

For all these reasons, this Court finds that those issues which the present record adequately presents for consideration have been made moot. This does not mean, however, that plaintiffs have no available remedy for raising issues similar to those argued in this case, including a per se challenge they might wish to raise.

Plaintiffs may challenge the latest rate schedule filed by REA. If it becomes apparent that REA filed schedule changes in an effort to make moot Commission or Court considerations of the rates, then plaintiffs may petition the Courts for injunctive relief. Plaintiffs also may challenge the use of any aggregate rate by the I.C.C. for REA. Since that issue has not been satisfactorily discussed by the Commission, it is proper that the plaintiffs should first raise the matter before the I.C.C., should they so desire. If this occurs, we can only hope that the Commission will focus its attention more precisely upon the issues raised by these and other arguments which plaintiffs may submit to it, and in so doing demonstrate that its handling of this case was only an isolated departure from a higher standard of care and diligence that is normally achieved.

The action will be dismissed for mootness.

Submit order.