# COURT OF APPEALS

OF

# NORTH CAROLINA

AT

# RALEIGH

STATE OF NORTH CAROLINA, ex rel. UTILITIES COMMISSION, KENAN TRANSPORT COMPANY and NORTH CAROLINA MOTOR CARRIERS ASSOCIATION, INC., Agent for Motor Common Carriers, Appellees v. BIRD OIL COMPANY, BURKE OIL COMPANY, LAMPLIGHTER OIL COMPANY, WEIL OIL COMPANY, NORWOOD OIL COMPANY, Appellants

No. 7910UC615

(Filed 3 June 1980)

1. Carriers § 5.1– common carrier rates – petroleum products – dedicated service provision – discriminatory and preferential rates

The dedicated service provision in the tariff schedule for motor vehicle common carriers of petroleum products, which provides for a lower rate for petroleum products when the common carrier assigns a single unit of equipment to the exclusive and continuous use of one shipper for a minimum of 100 hours per week for 20 consecutive weeks, is discriminatory and preferential in violation of G.S. 62-140 and other statutes relating to motor carriers.

2. Carriers § 5.1– common carrier rates – petroleum products – dedicated service provision – new business to common carrier system – sufficient evidence

There was not competent, material and substantial evidence in the record to support a finding that the dedicated service rate provision for common carriers of petroleum products attracts new business to the common carrier system; furthermore, attracting business to a common carrier is not a sufficient justification for such a discriminatory rate.

Judge VAUGHN dissenting.

APPEAL from the North Carolina Utilities Commission. Order entered 11 April 1979. Heard in the Court of Appeals 29 January 1980.

Utilities Comm. v. Oil Co.

This action involves a challenge to the dedicated service provision in the tariff schedule set by the North Carolina Utilities Commission (NCUC) for motor vehicle common carriers of petroleum products.

Pursuant to Chapter 62 of the North Carolina General Statutes, the North Carolina Utilities Commission has the authority to approve rates, fares and charges for common carriers by motor vehicles (G.S. 62-146), and motor vehicle contract carriers (G.S. 62-147), who engage in intrastate commerce. A "common carrier by motor vehicle" is defined as "any person which holds itself out to the general public to engage in the transportation by motor vehicle in intrastate commerce of persons or property or any class or classes thereof for compensation." G.S. 62-3(7). In contrast, a "contract carrier by motor vehicle" means any person which, in contract with another person or persons, as approved by the Utilities Commission, engages in transportation activities other than common carriages. G.S. 62-3. By way of distinction, a "private carrier" means "any person not included in the definitions of common carrier or contract carrier, which transports in intrastate commerce in its own vehicle or vehicles property of which such person is the owner, lessee, or bailee, when such transportation is for the purpose of sale, lease, rent, or bailment, or when such transportation is purely an incidental adjunct to some other established private business owned and operated by such person other than the transportation of property for compensation." G.S. 62-3(22). The Utilities Commission has no authority to regulate transportation activities of private carriers. G.S. 62-260(a)(16).

In the case before us, the North Carolina Motor Carriers Association (NCMCA) serves as agent for the motor vehicle common carriers which, pursuant to Local Motor Freight Tariff No. 5-0, N.C.U.C. No. 110, transport petroleum and petroleum products in bulk, in tank trucks from, to and between points in North Carolina. Appellee Kenan Transport Company is a motor vehicle common carrier represented by the NCMCA. The appellants, Bird Oil Company, Burke Oil Company, Lamplighter Oil Company, Weil Oil Company and Norwood Oil Company, are all "oil jobbers" who purchase petroleum products from the refin-

Utilities Comm. v. Oil Co.

ery and distribute the products to retail outlets or individual consumers.

The subject matter of this appeal centers around the following tariff schedule for intrastate common carriers of petroleum products in bulk in tank trucks, Supplement No. 8 to Local Motor Freight Tariff No. 5-0, Item No. 8005A:

"ITEM 8005-A (Cancels Item 8005 of Tariff)

### DEDICATED SERVICE

(a) The rates, charges, rules, regulations and provisions of this Section apply to the operation of a single unit of carrier's equipment assigned to the exclusive and continuous use of one shipper and when a combination of loading and unloading facilities are available to the carrier for the operation of that equipment for a minimum of one hundred hours per week ... for 20 consecutive weeks.

(b) A calendar week will begin at 12:01 a.m. Monday and run through 12:00 p.m. Saturday.

(c) The shipper will be deemed to be the party paying the freight charges.

(d) Time of arrival and/or departure of points of loading and/or unloading will be furnished shipper or carrier's forms upon request.

(e) Under the application of dedicated service, carrier will put into effect and operation a plan of unattended loading and/or unloading, only after prior written agreement between carrier, shipper and/or consignee."

The approval of the tariff schedule was based in part on the following findings of fact by the Utilities Commission in 1963:

" '3. The tariff filing offers a somewhat improved service to shippers who are in a position to utilize transportation service consistently and provides a reduced rate for consis-

tently [sic] and provides a reduced rate for consistent uti-
lization of carriers' equipment and services, which rates
and services are subject to contract between carrier and
shipper.

4. The proposed rates, considered in connection with the
consistent utilization of carriers' equipment, will be com-
pensatory and are found to be just and reasonable.' "

Docket No. T-825, Sub. 68 (27 September 1963).

In essence, the dedicated service section, Section 8 of Tariff
No. 5-0, provides for a fifteen percent lower rate on gasoline,
kerosene, jet fuel, naphtha, diesel fuel oil No. 1, and fuel oils
Nos. 1, 2 and 3, and a five percent lower rate on fuel oils Nos. 4, 5
and 6 and bunker C, provided that the common carrier assign a
single unit of the carrier's equipment to the exclusive and con-
tinuous use of one shipper for a minimum of one hundred hours
per week, for twenty consecutive weeks.

On 5 January 1978 NCMCA proposed a revision in the "Ded-
icated Service" provision Item 8005-A of Petroleum Tariff No.
5-0 in order to add the following "commingling" provision:

"(f) Hours generated by the dedicated unit of equip-
ment in Interstate Commerce will be applicable in deter-
mining the minimum of one hundred hours per week (PF
624-A)."

On 23 January 1978, the NCUC issued an order of suspen-
sion, investigation and notice of hearing, suspending Item 8005-
A, dedicated service, Paragraph (f), for a period of 270 days and
set the matter for hearing on 10 May 1978.

On 17 April 1978, the appellants filed a verified protest to
Item 8005-A, moved, pursuant to G.S. 62-136, to expand the
scope of the hearing to include an investigation and hearing of
the existing dedicated service rates found in Section 8 of the
Motor Freight Tariff No. 5-0, and further requested the NCUC
to order the motor vehicle common carrier participants in the
subject tariff to produce certain data.

On 2 May 1978, Kenan Transport Company (hereinafter Kenan Transport) on behalf of itself and other motor vehicle common carriers participating in the dedicated service tariff, filed a response in opposition to the protest.

On 4 May 1978, the NCUC issued an order allowing the protestants to intervene in opposition to the proposed revision in the dedicated service rules, expanded the scope of the hearing pursuant to G.S. 62-136 to include an investigation of the existing dedicated service rates contained in Section 8 of Motor Freight Tariff No. 5-0, ordered the motor vehicle common carriers participating in the tariff to file additional information, and continued the hearing to 2 August 1978.

Pursuant to the order of 4 May 1978, a hearing was held before a Hearing Examiner, Antoinette R. Wike, on 2 August 1978, at which time Kenan Transport presented evidence in support of the existing dedicated service rate and the proposed revision to include the commingling provision. The five oil jobbers, appellants herein, presented evidence in opposition to the existing dedicated service rules, including the proposed commingling provision.

On 5 January 1979, the Hearing Examiner issued a Recommended Order approving the revisions in Item 8005-A, canceling the prior order of suspension and investigation and dismissing the proceeding. The recommended order included the following findings of fact and conclusions of law:

"3. There are approximately eighty carriers in North Carolina having intrastate authority to transport petroleum products. At the time of hearing, three of these carriers had equipment dedicated to shippers. The commingling provision was proposed by Kenan Transport Company.

4. The applicable rates for dedicated service on light petroleum products are 15% lower than the applicable mileage rates. If the dedicated equipment is not utilized 100 hours in a given week, the shipper is billed $5.00 per

one-half hour or fraction thereof for the number of hours below 100.

5. The purpose of the proposed revision in Item 8005-A is to allow the carrier and the shipper to commingle interstate and intrastate traffic on one unit of equipment, with the hours generated by the interstate portion counting toward the 100 hours minimum required for the dedicated · intrastate rate.

6. Dedicated service attracts business. By spreading fixed costs over more business, the carriers have achieved and will continue to achieve lower unit costs. Additional costs such as record keeping, associated with a dedicated unit, are minimal.

7. The availability of dedicated service at lower rates has encouraged many shippers to discontinue private carriage thus resulting in an expansion of common carrier operations involving petroleum products. One hundred hours per week approximates the utilization which the oil company would achieve with its own equipment. The 20-week provision of the tariff is designed to encompass the five-month period (November-March) during which more light petroleum products, i.e. heating fuels, move.

8. Generally, shippers able to take advantage of existing dedicated service rates are major oil companies, such as Exxon, Texaco, Union, Phillips, Gulf, Mobile, Amerada Hess, A.T.C. Petroleum, Kenan, and Direct.

9. For the most part, smaller entities, such as the oil jobbers, are unable to take advantage of dedicated service rates since their facilities are open only 40-50 hours per week and they are either unwilling or unable to enter into unattended loading and unloading arrangements with a common carrier.

10. The price paid by the oil jobbers for gasoline is a delivered price less a freight allowance.

Utilities Comm. v. Oil Co.

11. When the dedicated rate was first approved in 1963, the oil jobbers were receiving the full common carrier rate as a freight allowance from their suppliers. Many, therefore, chose to purchase equipment and engage in the private transport of their products from terminals to their bulk holding facilities. At that time, such operations were a lucrative part of the oil jobbers' business.

12. A few years ago, 1972 in some cases, the petroleum suppliers began to use the lower, dedicated rate as the basis for a freight allowance. This, coupled with rising equipment costs, has created an increasingly disadvantageous situation for oil jobbers who are unable to qualify for the dedicated rate.

13. By increasing the use of such lower rates by the larger shippers, the proposed rules revision will tend to exacerbate the competitive disadvantage of the smaller shippers for whom dedicated service rates remain unavailable.

\* \* \* \*

1. The burden of proof is on the NCMCA to show that the proposed revision in dedicated service rules is just and reasonable. The burden of proof is on the Protestants to show that the existing dedicated service rates rules and regulations are unjust and unreasonable. G.S. 62-75.

2. The commingling provision contained in the proposed tariff will enable more petroleum shippers to qualify for dedicated service rates. Increased usage of such service will benefit the carriers by creating more traffic and lowering unit costs. The NCMCA has offered evidence showing that the subject rules revision is in the public interest. The oil jobbers have offered no evidence to the contrary. The Hearing Examiner concludes that the tariff should become effective.

3. The Commission previously has determined that existing dedicated service rates, rules and regulations are

just and reasonable. The oil jobbers have shown that not only are they effectively precluded from doing dedicated service by terms of the rules, the price they pay for certain petroleum products often is based on dedicated rates, thus eliminating any incentive to engage in private carriage and in fact raising their costs. Because their competitors more readily qualify for such rates, the oil jobbers contend that they suffer discrimination in the market place. While the oil jobbers' problem is understandable, it cannot be solved by the Commission's declaring unlawful a tariff which is lawful. The NCMCA has shown in this and earlier proceedings that dedicated service is sufficiently distinguishable from other common carrier service to warrant a difference in rates. Moreover, the oil jobbers' testimony shows clearly that their real complaint is not against the NCMCA but against the oil companies from whom they purchase petroleum products. They must look directly to their own contractural arrangements for relief."

On 22 January 1979, the appellants filed their exceptions to the Recommended Order. On 21 February 1979, the NCUC set exceptions for oral argument for 2 March 1979. Following the hearing on the exceptions, the NCUC issued the Final Order on 11 April 1979, which overruled and denied appellants' exceptions and affirmed the Recommended Order.

Pursuant to G.S. 62-90, the appellants, on 10 May 1979, filed their exceptions and notice of appeal of the 11 April 1979 order of the North Carolina Utilities Commission.

Other necessary facts will be stated in the opinion.

*Allen, Steed & Allen by Thomas W. Steed, Jr. for plaintiff appellees.*

*Hatch, Little, Bunn, Jones, Few & Berry by David H. Permar for defendant appellants.*

CLARK, Judge.

This appeal involves three challenges to the dedicated ser-

vice rate provision in the Local Motor Freight Tariff for bulk shipment of petroleum and petroleum products in tank trucks:

(1) That the dedicated service rate is discriminatory and preferential in violation of G.S. 62-140 because it allows a lower rate for some shippers than for others providing the same service;

(2) The dedicated rate requires the common carrier to violate its statutory and common law duty to provide equal and impartial service to all members of the general public, by, in effect, converting the common carrier into a contract carrier and allowing the carrier to charge a lower rate than that permitted to a contract carrier; and,

(3) That the order fails to include the requisite findings and conclusions required by G.S. 62-79 by failing to determine whether the commingling provision is just and reasonable as required by G.S. 62-130; that the order fails to determine whether dedicated rates are just, reasonable, sufficient and nondiscriminatory as required by G.S. 62-136; and that the order failed to determine whether a substantial difference in service or conditions existed, as required by G.S. 62-140.

## I. *TARIFF DISCRIMINATION*

[1] It is not for this Court to evaluate the merits of whether this State should in fact regulate motor vehicle common carriers. Our only task in a case of this nature is to ascertain whether the orders of the Utilities Commission conform to the mandate of the General Assembly. Unfortunately, there is a dearth of relevant North Carolina case law to guide us in interpreting the statute in the context of dedicated service. Nonetheless, we hold that the entire dedicated rate provision is discriminatory and preferential in violation of G.S. 62-140 and other applicable portions of the General Statutes pertaining to Motor Carriers.

Stripped of all the jargon, the question before us is whether large shippers can lawfully be given lower common carrier rates because they are larger, and thereby, in effect, be ex-

empted from sharing with smaller shippers the costs of utilizing the common carrier system as a whole. Such a result is not consonant with our statutory system of regulating common carriers.

Generally speaking, the present regulatory system is designed to insure that common carriers are available to ship goods for whomever calls upon their services. It is fundamental that all who ship goods with common carriers are required to be treated equally with respect to the same category of service:

> "No public utility shall, as to rates or services, make or grant any unreasonable preference or advantage to any person or subject any person to any unreasonable prejudice or disadvantage ...." G.S. 62-140(a) (1979 Cum. Supp.)

> "In addition to the declaration of policy set forth in G.S. 62-2 of Article 1 of Chapter 62, it is declared the policy of the State of North Carolina to preserve and continue all motor carrier transportation services now afforded this State ... to encourage and promote harmony among all carriers and to prevent discrimination, undue preferences or advantages, or unfair and destructive competitive practices between all carriers ...." G.S. 62-259.

As explained by W. David Fesperman, Traffic Manager of Kenan Transport, Inc., "The product involved here and transported whether under the regular rates or the dedicated rates is the same ... and the products are being carried to ... the same markets."

Our concern that this dedicated rate provision is discriminatory is triggered by the Commission's own Finding of Fact No. 13, that "[b]y increasing the use of such lower rates by the larger shippers, the proposed rules revision will tend to *exacerbate the competitive disadvantage of the smaller shippers* for whom dedicated service rates remain unavailable." (Emphasis supplied). This finding, we think, indicates that the dedicated rate provision contravenes the Commission's mandate "to pre-

serve and continue *all* motor carrier transportation services now afforded this state" and to prevent "undue preferences or advantages, or unfair and destructive competitive practices between all carriers." G.S. 62-259, *supra*. (Emphasis supplied).

The appellees do not dispute this effect. In fact, Kenan's representative even goes so far as to suggest that the best result would be for the small oil jobbers to sell all of their equipment and put all of their volume on common carriers. Kenan, in effect, wants to "attract business" to the common carriers though the effect may be to force small oil jobbers out of the petroleum transportation business. Again, this is not consonant with the Commission's statutory mandate.

Furthermore, it is apparent from Fesperman's testimony that Kenan would like to use the dedicated service provision to capture business for Kenan and to prevent the situation where "someone calls for a shipment and [Kenan doesn't] have a unit available, they go to somebody else." We see no reason under the statutory scheme why other motor vehicle common carriers should not have equal access to shippers of petroleum products.

Kenan argues, however, that there is no unreasonable or undue preference because there is a cost justification for the rate reduction. This argument does not withstand close scrutiny. Kenan presented the following chart of expenses at their Greensboro operation:

|                     | Non-Dedicated | Dedicated   |
|---------------------|---------------|-------------|
| Operating Expenses  | $328,062.00   | $83,818.00  |
| Other Deductions    | 320.00        | 86.00       |
| Overhead            | 47,888.00     | 12,806,00   |
| Total Expenses      | $376,270.00   | $96,710.00  |
| Shipments           | $  5,437.00   | $ 1,653.00  |
| Cost per Shipment   | $     69.21   | $    58.51  |

In explaining this charge, Mr. Fesperman stated:

"There is certainly economic justification for the dedicated rates. Many of the costs involved in operating are

*fixed costs,* and the increased utilization of the dedicated unit(s) gives a carrier a broader base over which to spread these fixed costs. Examples of *fixed costs* are mechanics' salaries, terminal managers' salaries, dispatchers' salaries, communication and utilities at the terminal, terminal rent, depreciation, and overhead expenses."

Later in his testimony, Mr. Fesperman stated:

"We are anticipating that we are going to be able to increase our business volume with the dedicated rates. This increased volume will enable us to spread our *fixed costs* over more business with less units. That is a justification for the dedicated rates." (Emphasis supplied).

The above statements emphasize that Kenan's primary economic justification for the dedicated rates is based upon lower average fixed costs;[1] such a justification, however, has been explicitly rejected by a federal court in the context of common carrier regulation under section 2 of the Interstate Commerce Act:[2]

---

[1]"Average variable costs (AVC) are those costs which are attributable to the operation of the enterprise as a productive unit — labor, raw materials, power, etc. — divided by the firm's output. Average fixed costs (AFC), on the other hand, are costs which over the short run would be incurred regardless of the operations *vel non* of the firm — examples of this sort of costs are lease payments, property taxes, investment, debt service, etc. — to get an average, fixed costs are divided by output."

*Central & Southern Motor Freight Tariff Association v. United States,* 273 F. Supp. 823, 829 (1967) at n. 6.

[2]Section 2 of the Interstate Commerce Act, 49 USC § 2 (1976) provides:

"If any common carrier subject to the provisions of this chapter shall, directly or indirectly, by any special rate, rebate, drawback or other device, charge, demand, collect, or receive from any person or persons a greater or less compensation for any service rendered or to be rendered, in the transportation of passengers or property subject to the provisions of this chapter, than it charges, demands, collects or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is prohibited and declared to be unlawful."

"Reduced average fixed costs — which always accompany increased volume when there is unused capacity — have never been considered an element of cost saving in traditional section 2 analysis. In fact, ... using such 'cost savings' to justify rate reductions would permit any rate reduction — where the carriers' demand curve was the slightest bit price elastic, and the carrier was not operating at full capacity — since rate reductions would increase demand, allowing the carrier to spread its fixed cost over a greater volume of shipping. Further, any such treatment of average fixed cost economics would run counter to the legislative spirit which is the very heart of Section 2."

*Central & Southern Motor Freight Tariff Association v. United States*, 273 F. Supp. 823, 829 (1967).

Similarly, in *Louisville East and St. Louis Consolidated Railroad Company v. Wilson*, 132 Ind. 517, 32 N.E. 311 (1892), the court held that it was unreasonable and discriminatory for a railroad to charge $14.00 per carload of crossties to one shipper and $24.00 per carload of crossties to another shipper, even though the shipper in whose favor the discrimination is made ships many more cars than any of the others. As pointed out by the court:

"It is contended by the appellant that in view of the fact it is secured by its contract with Dickerson a certain income of $7,000 per month, it could well afford to carry ties for him at $14.00 per car as to carry them for the appellees at $24.00 per car. We find it unnecessary to inquire whether the appellant is correct or otherwise in this contention for, as we understand the law, a railroad company engaged in the business of *a common carrier is not permitted by the law to discriminate in favor of a shipper who is able to furnish a large amount of freight over one engaged in the same business who is unable to furnish the same quantity as that shipped by his more opulent rival.*"

32 N.E. at 314-15. (Emphasis added.) We note that the exception to this rule for broken shipments, discussed in *Louisville, supra*, does not apply herein, because as in *Louisville*, we are talking about the same commodities, "shipped in full carloads, and from the same stations." *Id.*

By its very nature, a common carrier which by statute holds itself out to serve everyone on call cannot obtain the same efficiencies of operation that may be obtained on a single route for a single customer who uses the same equipment with great frequency. Nonetheless, it is fundamental that all shippers, both large and small, share the common burden of the common carrier system. It is also true that with more business attracted to the common carrier system, there will be greater utilization of the equipment of all carriers and there will be lower average costs for all carriers. The dedicated rate provision, however, has the effect of allocating all the efficiencies of higher utilization to the large shippers while at the same time allocating an undue burden of maintaining the common carrier system to the smaller shippers. It is true that the large vertically integrated petroleum companies still have the prerogative to utilize their own private transports rather than rely upon common carrier services. Nonetheless, if they elect to use common carriers of petroleum products they must pay the same rates as other shippers of petroleum products where they ship the same products to the same markets.

The appellees also contend, in line with the Hearing Examiner's Conclusion No. 3, that the appellants must look to their own contractual arrangements for relief. The Commission found that the use of the dedicated rate as the basis for a freight allowance in the contracts between appellants and the petroleum refiners created a disadvantageous situation for oil jobbers unable to qualify for dedicated rates. There is no doubt that this is a matter of private contract, and there is no claim herein of unfair trade practices or antitrust violations on the part of the oil companies. Nonetheless, the contractual provisions are not the only source of discrimination against the appellants: the dedicated rate provision itself unreasonably discriminates against smaller oil jobbers. An oil jobber who does not operate his own petroleum transports must rely upon the petroleum common carriers to transport his product from the pipeline terminal to his bulk plant and filling stations. The fact that he must pay a full tariff, while at the same time some of his competitors such as Exxon and Texaco are paying a fifteen percent lower rate for transportation, means that the product that he sells or distributes must be sold at a higher price. This competitive price disadvantage means that the oil jobber sup-

plied or operated service stations will lose business to the major oil company-owned-or-operated filling station which has its fuel transported under the dedicated service rate.

## II. *ATTRACTION OF NEW BUSINESS TO COMMON CARRIERS.*

[2]  Appellees also argue, in effect, that the dedicated rate provision is justified because it attracts new business to the common carrier system. There is not "competent, material and substantial" evidence in the record to support the assertions in Findings of Fact Nos. 6 and 7 that the dedicated rate tariffs do or will cause the large oil companies to dispose of their private carriage operations and instead use the services of common carriers. G.S. 62-94(b)(5). Nor is there material and substantial evidence indicating whether revenue earned under dedicated service comes from new business or from business merely shifted from "full fare traffic" to the "dedicated service" traffic which receives a fifteen percent lower rate.

The only testimony in this regard comes from Mr. Fesperman, Kenan's Traffic Manager, who stated as follows:

"Major oil companies are looking to provisions such as this to match their own utilization factors so that they can get out of private carriage. This would result in an expansion of common carrier operations in North Carolina and would be beneficial to the common carrier system.

\*   \*   \*   \*

By operating these units 100 hours per week, a common carrier can approach more closely the utilization that an oil company gets on its own equipment. As we approach or pass that utilization, the oil companies tend to eliminate their own private carriage, making more transportation available to the common carriers, and increases our safety and stability within the State of North Carolina.

\*   \*   \*   \*

I am not familiar with any shipper approaching Kenan

asking us to sponsor the commingling provisions of the dedicated rate. We do specifically have in mind serving North Carolina and Southern Virginia out of the Friendship Terminal under the dedicated rate if the commingling provision is adopted. In my original testimony filed with the Commission, I mentioned Texaco and Exxon as companies that were looking to utilizing the commingling provision of the tariff. Texaco and Exxon have asked us about the availability of the dedicated plans. A commingling proposal is an essential part of getting a dedicated plan to operate to its maximum effectiveness.

\* \* \* \*

If we decrease the dedicated service hours and more traffic becomes available to be handled under the dedicated plan, some of that traffic is going to be traffic with common carriers that the common carrier does not handle today. It is going to be traffic that is handled in private carriage."

These hypothetical or theoretical statements by Mr. Fesperman do not establish whether the dedicated rate provision has in fact given the common carriers business that otherwise would have been handled by the oil companies' owned transports. It is one thing for the Commission to base a new experimental rate structure upon such testimony, but it is quite another for the Commission to rely on such hypothetical testimony when the actual tariff structure has been in effect for fifteen years. It would have required little effort on the part of the appellees herein to have requested the testimony of officials from the major petroleum companies pertaining to: (1) the cost of the companies' private carriage operations; (2) the question of whether they have dismantled some of their private carrier operations because of the dedicated rates; or (3) whether because of the rates they have not procured transport equipment they would have otherwise procured. In sum, the statutory words "competent, material and substantial" must be given their literal meaning and applied in substance, particularly where the evidence must justify a finding that a rate provision which is discriminatory on its face is nonetheless reasonable. *See, e.g., Central & Southern Motor Freight Tariff Association,*

Utilities Comm. v. Oil Co.

*Inc. v. United States,* 345 F. Supp. 1389, 1393-95 (1972) (appeal after remand).

Nor do we think that appellees may rely upon evidence presented before the Commission prior to its order of 27 September 1963, which order was issued fifteen years before the hearing now controverted and for which the supporting testimony was not included in the record in this appeal. See N.C. Rules App. Proc. 18 (c)(v)-(vii). While we would not go so far as to say that all the evidence must be "new" evidence, the record must nonetheless indicate that the Commission had before it sufficient evidence upon which to base its findings. If testimony from an earlier proceeding is relied upon to justify a finding of fact in a later proceeding (and we have doubts as to the merits of this practice), at the very least, the relevant portions of the earlier testimony must also be included in the record on appeal in a case where the sufficiency of facts to support that finding is challenged.

Even if such evidence were in the record, attracting business to a common carrier is not a sufficient justification for a discriminatory rate. In *State ex rel. Kohler, Attorney General v. Cincinnati, W. & B. Railway Company,* 47 Ohio State 130, 23 N.E. 928 (1890), the common carrier charged a substantially lower rate for transporting petroleum in bulk in tank cars as compared to transporting petroleum in barrels. The court stated:

"The justification interposed is that this was not done pursuant to any confederacy with the favored shipper, or with any purpose to inflict injury on their competitors, *but in order that the railroad companies might secure freight that would otherwise have been lost to them.* This we do not think sufficient . . . . As common carriers, their duty is to carry indifferently for all who may apply, and in the order in which the application is made, and upon the same terms; and *the assumption of a right to make discriminations in rates for freight,* such as was claimed and exercised by the defendants in this case, freight, *that it would otherwise lose, is a misue of the rights and privileges conferred upon it by law.*" 23 N.E. at 930. (Emphasis supplied).

This is an old case from another jurisdiction but we can find no compelling reason as to why the principles articulated therein should not be the law in this State at this time.

### III. *CONTRACT CARRIAGE AND OTHER USES.*

As we have held that the dedicated rate provision is unreasonably discriminatory we do not need to address the question as to whether the dedication of equipment for a twenty-week period is inconsistent with common carriage. Nor are we compelled to answer the remainder of appellants' challenges.

The Order of the Commission, dated 11 April 1979, in Docket No. T-825, Sub. 226, establishing Paragraphs (a)-(f) of Item 8005-A in Local Motor Freight Tariff No. 5-0, is

Vacated.

Judge HEDRICK concurs.

Judge VAUGHN dissents.

Judge VAUGHN dissenting: I respectfully dissent from the well-written opinion of my learned colleagues. I note first that the existing rate structure is presumed to be just and reasonable and that the burden was upon the appellants to show that it was unlawful. Moreover, the findings of the Commission are conclusive if they are supported by competent material and substantial evidence in view of the entire record, and I conclude that they are so supported in this case. Incentive rate structures based on use intensity are widely authorized, and the question of their employment should generally be a matter for the specialized regulatory agency and not the courts. If appellants pay more for the petroleum they buy than others, that result springs from the pricing policies of the oil companies — a matter beyond the jurisdiction of the Utilities Commission. I vote to affirm the order.